23-6379-cr (L)
*United States v. Velissaris*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

# SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT.  CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1.  WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER").  A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 16th day of October, two thousand twenty-four.

Present:    BARRINGTON D. PARKER, JR.,
            WILLIAM J. NARDINI,
            BETH ROBINSON,

                    *Circuit Judges.*

_____

UNITED STATES OF AMERICA,
            *Appellee*,

        v.                                                            23-6379-cr (Lead)
                                                                      23-6953-cr (Con)

JAMES VELISSARIS, AKA Sealed Defendant 1,
            *Defendant-Appellant*.

_____

*For Appellee*:                 MARGARET GRAHAM (Nathan Rehn, *on the brief*)
                                Assistant United States Attorneys, *for* Damian
                                Williams, United States Attorney for the Southern
                                District of New York, New York, NY.

*For Defendant-Appellant*:      AARON D. LINDSTROM, Barnes & Thornburg LLP,
                                Grand Rapids, MI.

1

Appeal from a judgment of the United States District Court for the Southern District of New York (Denise L. Cote, *District Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the appeal is **DISMISSED** with respect to the term of imprisonment, and the judgment is **AFFIRMED** in all other respects.

Defendant-Appellant James Velissaris appeals from a judgment of the United States District Court for the Southern District of New York (Denise L. Cote, *District Judge*) sentencing him to a 180-month prison term, three years of supervised release, a $50,000 fine, a $100 special assessment, forfeiture of $22 million, and approximately $126 million in restitution for securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff. Following a six-count indictment, Velissaris pled guilty to one count of securities fraud stemming from his time as majority owner and Chief Investment Officer (CIO) of investment advisory firm Infinity Q Capital Management, LLC ("Infinity Q"), where, between 2018 and 2021, he fraudulently manipulated the valuation of over-the-counter derivative positions to increase Infinity Q's reported net asset value. Prior to sentencing, the district court denied Velissaris's motion to withdraw his guilty plea, which he had filed four months after entering the plea. *United States v. Velissaris*, No. 22 CR 105 (DLC), 2023 WL 2875487, at *20 (S.D.N.Y. April 10, 2023). In a separate opinion and amended judgment, the district court ordered restitution of roughly $126 million. *United States v. Velissaris*, No. 22 CR 105 (DLC), 2023 WL 4702049, at *1, *7-10 (S.D.N.Y. July 24, 2023). On appeal, Velissaris argues that the district court (1) abused its discretion by denying the motion to withdraw his guilty plea and (2) erred in calculating loss to investors at sentencing, resulting in an erroneous calculation of his offense level under the U.S. Sentencing Guidelines and of the restitution amount.

2

We disagree on all points and, accordingly, dismiss in part and affirm in part. We assume the parties' familiarity with the case.

## I. Motion to Withdraw Guilty Plea

"A defendant may withdraw a plea of guilty or nolo contendere . . . after the court accepts the plea, but before it imposes sentence if . . . the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). A defendant "bears the burden of demonstrating both that there are valid grounds for withdrawal and that such grounds are not outweighed by any prejudice to the government." *United States v. Avellino*, 136 F.3d 249, 261 (2d Cir. 1998).[1] We review the denial of a motion to withdraw a guilty plea for abuse of discretion. *United States v. Juncal*, 245 F.3d 166, 170–71 (2d Cir. 2001).

"To determine whether the defendant has proffered a 'fair and just reason' to justify withdrawal, a district court should consider, inter alia: (1) the amount of time that has elapsed between the plea and the motion; (2) whether the defendant has asserted a claim of legal innocence; and (3) whether the government would be prejudiced by a withdrawal of the plea." *United States v. Doe*, 537 F.3d 204, 210 (2d Cir. 2008). Here, four months after entering his plea, Velissaris consulted new counsel and changed his mind about whether his conduct amounted to a crime. But "[t]he fact that a defendant ha[d] a change of heart prompted by his reevaluation of either the Government's case against him or the penalty that might be imposed is not a sufficient reason to permit withdrawal of a plea." *Id.* at 212 (quoting *United States v. Gonzalez*, 970 F.2d 1095, 1100 (2d Cir. 1992)). In his plea allocution, Velissaris freely admitted as follows:

---

[1] Unless otherwise indicated, when quoting cases, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted.

3

> I made false statements of material fact to investors in the Infinity Q funds that I managed, and I did so knowingly, willfully, and with the intent to defraud. Specifically, I told investors that I was using an independent Bloomberg system to value the fund's over-the-counter derivatives. However, I was making manual adjustments in the system which increased the values of over-the-counter derivative positions that were reported. I knew that if I disclosed what I was doing, investors might have decided to redeem their investments or maybe would not have made the investments in the first place. Some of the communications with investors occurred over the phone and by email in the Southern District of New York. I acknowledge that my actions caused investors to lose money, and for this I am truly sorry.

Appellant's App'x at 424-25. When the court asked what Vellisaris's purpose was when he adjusted the values, Vellisaris replied: "To increase the value of the securities being held by the fund." *Id.* at 425. This allocution—which Vellisaris does not challenge here—was sufficient to satisfy the elements of securities fraud, meaning that he is not, as he contends, legally innocent of that crime. *See United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013) ("[T]he government must prove that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation . . . . [T]o impose criminal liability, the government must also prove that the defendant willfully violated the law."). Therefore, we conclude that Velissaris has not carried his burden of showing a fair and just reason for withdrawing his plea.

Velissaris's arguments to the contrary are unpersuasive. First, he argues that his representations to investors that he would be using the independent valuation tool known as Bloomberg Valuation Service ("BVAL") cannot have been material, because Infinity Q had already disclosed to investors that the valuations could be adjusted. However, Infinity Q's disclosures were far more circumscribed than Velissaris alleges. The company disclosed that it could alter derivative valuations only after following specific company protocols and approvals—procedures that Velissaris does not claim to have followed when he unilaterally altered the asset valuations while representing to investors that he relied on independent BVAL evaluations.

Velissaris also argues that his guilty plea allocution did not support the district court's conclusion that his alterations constituted fraudulent mismarking of Infinity Q's derivative positions if his alterations were objectively correct. But in his allocution, Velissaris admitted that if he had disclosed his routine reprogramming of valuation models to increase Infinity Q derivative valuations, "investors might have decided to redeem their investments or maybe would not have made the investments in the first place." Appellant's App'x 425. These admissions demonstrate that his misrepresentations were material, that is, that there was "a substantial likelihood that a reasonable investor would find [those misrepresentations] important in making an investment decision." *United States v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012). And Velissaris admitted in his plea colloquy that he acted with "intent to defraud," which in these circumstances can only be understood as a deliberate choice to conceal from investors what he knew to be material information. Appellant's App'x 425.

Relatedly, Velissaris suggests that because Infinity Q generally disclosed that it could alter derivative valuations, his misrepresentations cannot have been material in light of the "bespeaks caution" doctrine. That doctrine provides that a "forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Employees' Ret. Sys. v. MF Glob. Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010). But that safe harbor is inapplicable here because Velissaris was not charged with making misleading forward-looking statements. Rather, he was charged with and pled guilty to making material misrepresentations about his *ongoing* administration of the asset valuation process within Infinity Q–that is, an omission of present fact.

Velissaris also contends that the district court abused its discretion when it considered evidence beyond his plea allocution in denying his plea withdrawal. This argument is also unavailing. We have long recognized a district court's ability to consider evidence in the record beyond a defendant's plea allocution in ruling on a motion to withdraw a plea. *See, e.g.*, *United States v. Maher*, 108 F.3d 1513, 1519, 1528–31 (2d Cir. 1997) (affirming denial of plea withdrawal where the district court had considered "the evidence presented at trial" in addition to the plea allocution).

Velissaris does not contend that the district court abused its discretion in finding that the four-month delay between his plea and withdrawal motion weighed in favor of denying his motion. *See United States v. Albarran*, 943 F.3d 106, 123 (2d Cir. 2019) ("The four-month lapse between his guilty plea and his motion to withdraw the plea further supports the District Court's exercise of discretion in denying Albarran's request."). With this concession and finding no merit to Velissaris's legal innocence theory, we conclude that the district court acted well within its discretion when it denied Velissaris's motion to withdraw his guilty plea.

## II.    Restitution

Next, Velissaris argues that the district court erred in determining that he caused almost $126 million in losses to investors. Specifically, he contends that BVAL is an unsound derivative pricing tool, and that the district court erred in relying upon it. This methodology, he claims, overstated loss for purposes of both determining his offense level under the Sentencing Guidelines and calculating restitution. We disagree.

We review a district court's loss determination for clear error, *see United States v. Lacey*, 699 F.3d 710, 719 (2d Cir. 2012), and we will find such error "only if, after reviewing all of the

evidence, [we are] left with the definite and firm conviction that a mistake has been committed," *United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015). Separately, an order of restitution under the Mandatory Victims Restitution Act (MVRA), which may be awarded only in the amount of losses proximately caused by a defendant's conduct, *see United States v. Reifler*, 446 F.3d 65, 115 (2d Cir. 2006), is reviewed "deferentially, and we will reverse only for abuse of discretion." *United States v. Gushlak*, 728 F.3d 184, 190 (2d Cir. 2013). A district court abuses its discretion when a "challenged ruling rests on an error of law, a clearly erroneous finding of fact, or otherwise cannot be located within the range of permissible decisions." *United States v. Boccagna*, 450 F.3d 107, 113 (2d Cir. 2006).

As a preliminary matter, we conclude that Velissaris waived any right to appeal his prison sentence, and hence his offense level calculation. The parties stipulated that the offense caused a loss of between $65 million and $150 million, yielding a 24-level enhancement to his base offense level under U.S.S.G. § 2B1.1. His total offense level of 38, combined with his criminal history category of I, yielded an advisory sentencing range of 235 to 240 months. During his guilty plea colloquy, Velissaris waived his right to appeal any prison sentence to the extent it was within or below that stipulated range, and the district court confirmed that Velissaris understood the appellate waiver. Because the district court ultimately imposed a prison term of 180 months, and because Velissaris raises no basis for invalidating the waiver, we dismiss his appeal with respect to the calculation of loss as it pertains to the Guidelines. *See United States v. Burden*, 860 F.3d 45, 51 (2d Cir. 2017).

The plea agreement contains no appeal waiver with respect to restitution, and so we consider the merits of Velissaris's challenge to that portion of his sentence. We conclude that the

district court did not err, let alone clearly so, in finding that the loss from Velissaris's fraud was nearly $126 million. In securities fraud cases, "[t]he challenge . . . is to determine if and to what extent particular investors have been harmed by artificial prices that are the result of deliberate misinformation of one sort or another (including manipulative trading practices designed to inflate the price)." *Gushlak*, 728 F.3d at 196. The district court's loss calculation included two components: (1) the loss to those who held their positions in the fund resulting from overpayments from the fund to shareholders who sold their positions at the inflated rates, and (2) excess management fees to Infinity Q. The district court determined that the excess payouts caused around $99.4 million in loss resulting from Velissaris's manipulation of fund asset values. Of this amount, Velissaris contests only $54 million. Velissaris faults the district court for calculating this figure by revaluing a portion of Infinity Q's securities (excluding Velissaris's fraudulent alterations) using BVAL—which he claims is an unreliable tool. Yet, BVAL was the pricing device that Velissaris told investors he would use when valuing Infinity Q's derivative positions and which he surreptitiously changed to alter those valuations—and it was those increased valuations that caused Infinity Q to extract higher fee payments. Thus, revaluing Infinity Q's securities as investors had expected—that is, using BVAL without Velissaris's alterations—was a reasonable, albeit imperfect, method of approximating the losses caused by the defendant's fraud. *Gushlak*, 728 F.3d at 196 ("So long as the basis for a reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution.").

Velissaris directs our attention to two cases that he says offer support for his claim that the restitution order should be vacated: *United States v. Tanner*, 942 F.3d 60, 67 (2d Cir. 2019), and

8

*United States v. Finazzo*, 850 F.3d 94, 117 (2d Cir. 2017). Both cases support the general proposition that a court must rely on a sound methodology when calculating loss, but neither suggests that the district court failed to do so here. In both *Tanner* and *Finazzo*, which involved kickback schemes, our Court vacated restitution orders because the financial loss amounts were not clearly attributable to the defendant's criminal conduct. *See Tanner*, 942 F.3d at 67; *Finazzo*, 850 F.3d at 117–19. In this case, by contrast, Velissaris admitted that his manipulation of the BVAL models yielded increased valuations of Infinity Q's derivative holdings; and it is undisputed that higher valuations resulted in corresponding increases in management fees and payments to redeeming shareholders. Thus, there is no question surrounding loss attribution here.

\* \* \*

Accordingly, we **DISMISS** the appeal with respect to the term of imprisonment and **AFFIRM** the judgment in all other respects.

FOR THE COURT:
Catherine O'Hagan Wolfe,
Clerk of Court

9